HYDE v UNIVERSITY OF MICHIGAN BOARD OF REGENTS

Docket Nos. 181187, 190178. Submitted March 13, 1997, at Detroit. Decided November 25, 1997, at 9:00 A.M.

Maurice Hyde, an African-American, brought an action in the Washtenaw Circuit Court against the University of Michigan Board of Regents, alleging disparate treatment in employment, retaliation, and discriminatory discharge on the basis of race. The plaintiff also alleged breach of contract, which count was heard separately by the circuit court sitting by stipulation as the Court of Claims. The court, Patrick J. Conlin, J., granted the defendant's motion for partial summary disposition with regard to the plaintiff's claim that his assignment was reduced from full-time to part-time because of his race. A jury heard the disparate treatment, retaliation, and discriminatory discharge claims and found that the plaintiff was not discharged from employment because of his race, that he was not retaliated against because of his complaints of discrimination, and that he was not entitled to any monetary back pay. The jury found that the defendant discriminated against the plaintiff by treating him differently than nonminorities, and awarded him noneconomic damages for outrage, indignation, humiliation, and embarrassment. The jury awarded the plaintiff $20,000, plus court costs and attorney fees. The Court of Claims action was decided adversely to the plaintiff. The plaintiff appealed, and the defendant cross appealed. (Docket No. 181187). The plaintiff also appealed from the trial court's order awarding the defendant mediation sanctions for the plaintiff's rejection of the mediation evaluation. (Docket No. 190178). The appeals were consolidated.

The Court of Appeals *held*:

1. Partial summary disposition was properly granted with regard to the plaintiff's claim that his change from full-time to part-time status was motivated by illegal race discrimination.

2. Where, as here, the plaintiff in an employment discrimination case seeks more than economic damages from an employer, the defendant employer may pursue normal discovery of the plaintiff's emotional and mental history. A plaintiff who prefers to shield the plaintiff's mental and emotional history from discovery may do so, but only if all claims for mental or emotional distress damages are

withdrawn, including claims for damages arising out of embarrassment, anger, indignation, humiliation, and all similar issues. Where, as here, a plaintiff asserts the physician-patient privilege to shield psychological or mental history from discovery, it is error to allow the plaintiff to seek noneconomic damages or to introduce evidence of noneconomic injury.

3. The court erred in attempting to create two separate categories of psychic injuries: "serious" and "garden variety." The court properly prevented the plaintiff from presenting more specific and additional evidence of mental anguish.

4. The plaintiff did not preserve for appellate review his allegation that the verdict with regard to the issues of retaliation and termination was contrary to the great weight of the evidence.

5. The mediation sanctions imposed on the plaintiff must be affirmed.

6. The jury's verdict against the plaintiff regarding the claims of discriminatory discharge and retaliation precludes the retrial of any issues concerning economic damages on remand. The Court of Appeals ruling precluding the claims for noneconomic damages where the privilege has been invoked precludes the retrial of any issues concerning noneconomic damages on remand. Therefore, because there can be no evidence of damages on remand, there is no need for a new trial. The judgment reflecting the jury verdict for noneconomic damages and the award of costs and attorney fees must be reversed and the matter must be remanded for entry of a judgment of no cause of action. The remainder of the court's rulings in other respects must be affirmed.

Affirmed in part, reversed in part, and remanded.

1. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — EVIDENCE — NONECONOMIC DAMAGES — DISCOVERY.

A plaintiff in an employment discrimination and wrongful discharge case brought under the Civil Rights Act who seeks recovery for noneconomic damages, such as pain and suffering, mental distress, hurt feelings, or embarrassment, places the plaintiff's mental condition in issue and consequently open to discovery; a plaintiff who asserts a privilege to prevent discovery with regard to this issue must withdraw, or the court must dismiss, any claim for noneconomic damages (MCR 2.314[A],[B]; MCL 37.2101 *et seq.*; MSA 3.548[101] *et seq.*).

2. CIVIL RIGHTS — ACTIONS — PSYCHIC INJURIES.

Victims of discrimination may recover for psychic injuries such as humiliation, embarrassment, outrage, disappointment, and other forms of mental anguish that flow from discrimination; Michigan

courts have not recognized a two-tiered approach to emotional or psychic injuries that would create separate categories for "serious" and "garden variety" injuries.

3. PRETRIAL PROCEDURE — MEDIATION — APPEAL — SANCTIONS.

It is the ultimate verdict that the parties are left with after appellate review is complete that should be measured against a mediation evaluation to determine whether sanctions should be imposed on a rejecting party pursuant to MCR 2.403(O).

*Green, Green & Craig, P.C.* (by *Philip Green* and *Christine A. Green*), for the plaintiff.

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *Richard J. Seryak* and *Megan P. Norris*), for the defendant.

Before: SAWYER, P.J., and SAAD and GAGE, JJ.

SAAD, J.

I

NATURE OF THE CASE

In this case we address several legal issues, but highlight here the key issue of first impression. In an employment discrimination, wrongful discharge case brought under the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, may a plaintiff seek more than economic damages yet shield from discovery his mental history? Our answer is clear and simple: no. If a plaintiff, as here, seeks more than economic damages from his employer, the defendant-employer may pursue normal discovery that includes discovery of the plaintiff's emotional and mental history.[1] If plaintiff prefers to shield his mental and emotional history from discovery, he may do so but only

---

[1] This rule applies equally to a suit against an individual defendant.

if he withdraws all claims for mental or emotional distress damages, including claims for damages arising out of embarrassment, anger, indignation, humiliation, and all similar issues. Because the trial court erred in allowing plaintiff to seek noneconomic damages after shielding his psychological or mental history from discovery by asserting the privilege, we reverse the lower court's judgment with regard to those damages and the award of costs and attorney fees and affirm the circuit court's rulings with regard to the other issues raised herein.

## II

### FACTS AND PROCEDURAL HISTORY

At all times relevant to this case, the University of Michigan School of Social Work had a contract with the UAW-Ford Motor Company National Education, Development & Training Center (UAW-Ford Center) located in Dearborn, to provide academic and career counseling to Ford's union workers. Plaintiff, an African-American male, was hired by the University of Michigan in 1985 to work as a Regional Life Education tion Advisor (RLEA) with the Life/Education Planning Program (LEPP) for the UAW-Ford Center. Plaintiff's duties as an RLEA required travel to various Ford plants in his region, at which he developed and presented workshops and seminars for Ford employees.[2]

Plaintiff testified at trial that although he allegedly enjoyed a good working relationship with his previous supervisors, problems began about a year after

---

[2] Plaintiff also worked a second job as a wedding coordinator, providing a variety of services, including singing at ceremonies.

Justine Bykowski became his supervisor in 1986 or 1987. Plaintiff filed a formal grievance against Ms. Bykowski in August, 1990, alleging racial discrimination and challenging her alleged "confrontational and inflexible management style." After a hearing, a grievance panel unanimously found no evidence of discrimination, but called for both parties to "communicate clearly."

In 1989 and 1990, Ms. Bykowski wrote three disciplinary memos to plaintiff addressing alleged travel irregularities. Sometime later, plaintiff's employment was reduced from full-time to half-time by the UAW-Ford Center. Plaintiff filed a second grievance against Ms. Bykowski, again alleging racial discrimination. On April 16, 1992, a panel again found no evidence of discrimination. Indeed, one African-American member that sat on both grievance panels (by plaintiff's choice) attributed the difficulties between Bykowski and plaintiff to a personality conflict, rather than race.

According to plaintiff, after his second grievance his relationship with Bykowski continued to deteriorate until the "Buffalo" incident at the Buffalo, New York, plant on September 1-3, 1992. On August 24, 1992, plaintiff was asked to service the Buffalo plant beginning on September 1, and he agreed to do so. On August 29, 1992, a friend asked plaintiff to sing in Chicago at the funeral of the friend's father, and plaintiff telephoned Bykowski repeatedly to ask if his schedule could be changed. She made inquiries with the UAW-Ford Center and reviewed schedules of other regional RLEAs to determine if anyone could take plaintiff's place. However, when she was unable to

find a replacement, she notified plaintiff that he could not alter his schedule.

Plaintiff refused to accept Ms. Bykowski's answer, and he proceeded to contact others in the program, including people at the UAW-Ford Center in Dearborn and the local co-chair at the Buffalo plant, as well as some of Ms. Bykowski's superiors in an attempt to override her determination. Eventually, plaintiff and Bykowski spoke by telephone again and Bykowski faxed plaintiff a memo telling him to fulfill the Buffalo assignment. Plaintiff did fulfill his obligations in Buffalo, but also sent a reply to Bykowski, in which he included the statement, "Also, at all costs you forego all professional management skills and opt to perform behaviors that border on what I believe are tactics adopted by the white supremacy." Plaintiff sent copies of his letter to Harold Johnson (the dean of the university's School of Social Work under which the LEPP was administered), Shirley Anderson, the dean's assistant, Program Director Bob Toronto, as well as Ron Dick and Dan Gamble of the personnel department.

Following notification and a hearing, plaintiff was discharged on October 16, 1992. Mr. Toronto and Ms. Anderson recommended plaintiff's dismissal to Dean Johnson, who himself felt that the discharge was long overdue, and who instructed Toronto to "proceed with all speed." (Johnson, an African-American, described plaintiff as being noted for irregular expenditures, having difficulty in accepting assignments, and using poor judgment.) After further consultation with Dean Johnson, Mr. Toronto decided that plaintiff's employment should be terminated and

he authorized plaintiff's termination letter, which stated:

> In the recent episode at Buffalo Stamping, a routine scheduling decision made, in order to meet the needs of the program, was transformed by you into a point of contention which disrupted the work of numerous people. By your involving others in and outside of the University in your attempt to override the scheduling decision, you placed your personal convenience and priorities above those of the University, the Sponsor, the local site and the program as a whole. Your conduct damaged our relationship with the sponsor and the location and disrupted the provision of service to workers. This was inexcusably unprofessional.
>
> The Buffalo episode, in and of itself, would have caused me to consider the termination of your employment. In the context of the prior written warnings and your apparent inability to understand and appreciate the negative impact of your actions on the University's relationship with its Sponsor, such action is inescapable.
>
> Your position in the [Disciplinary Review Conference] was that there was nothing wrong with your conduct in this or any other instance. This strengthened my conviction that termination was the only outcome that would meet the long term needs of the Program.

Plaintiff brought this suit against the University of Michigan Board of Regents *only*, not the UAW-Ford Center or any individual (including Bykowski). In summary, plaintiff alleged: (1) disparate treatment on the basis of race in regard to his travel arrangements, assignments, work schedules, and criticisms from his supervisor, (2) retaliation for having filed two grievances alleging race discrimination, (3) termination from employment in October 1992, on the basis of illegal race discrimination, and (4) breach of contract.

On March 8, 1994, the trial court granted defendant's motion for partial summary disposition regard-

ing plaintiff's claim that his assignment was reduced from full-time to part-time because of his race; the court determined that plaintiff had failed to raise a genuine issue of fact for trial that the decision had been made by the defendant, rather than by the UAW-Ford Center, whom plaintiff had not sued.

The case proceeded to a jury trial of plaintiff's disparate treatment, retaliation, and discriminatory discharge claims.[3] The jury found that plaintiff was not discharged from employment because of his race, that he was not retaliated against because of his complaints of discrimination, and that he was not entitled to any monetary back pay. The jury found that defendant discriminated against plaintiff by treating him differently than nonminorities, and awarded him noneconomic damages for outrage, indignation, humiliation, and embarrassment. The jury awarded $20,000, plus court costs and attorney fees.

On appeal, in Docket No. 181187, plaintiff raises several substantive issues, one of which is cross appealed by defendant. In Docket No. 190178, plaintiff raises certain procedural issues involving mediation sanctions. The appeals were consolidated.

III

ANALYSIS

A

Plaintiff first alleges that the circuit court erred in granting partial summary disposition with regard to his claim that his change from full-time to part-time

---

[3] The breach of contract count was heard separately by the circuit court sitting by stipulation as the Court of Claims, which has jurisdiction over contract and other common-law claims against defendant.

status was motivated by illegal race discrimination. We disagree.

As a threshold matter, it is undisputed that it was the UAW-Ford Center, not the defendant university, that made the decision to reduce plaintiff's status. It is similarly undisputed that, in response to the UAW-Ford Center's request for information, Ms. Bykowski provided the center with statistical information regarding the services actually performed by the RLEAs. Plaintiff claims that Ms. Bykowski's alleged racial animus tainted the center's ultimate decision. However, plaintiff was unable to present facts to support his contention. In response to defendant's motion, plaintiff presented no evidence that the statistics compiled by Bykowski were inaccurate or slanted, or that the statistics were not based on the reports actually submitted by the RLEAs themselves. Although plaintiff stated that "further discovery will very likely shed additional light on these questions," plaintiff failed to show by affidavit that further development would support his claims. MCR 2.116(H). Thus, had Bykowski harbored illegal discriminatory animus, plaintiff was unable to show that it contributed in any way to the UAW-Ford Center's decision to reduce plaintiff's hours. See *McDonald v Union Camp Corp*, 898 F2d 1155, 1161 (CA 6, 1990). We find no error.

B

The parties next cross appeal various noneconomic damages issues, for which an additional factual discussion is necessary. In his complaint, plaintiff alleged that, as a result of defendant's racial discrimi-

nation, he suffered, inter alia, "mental anguish, outrage, embarrassment and humiliation."

The applicable Michigan Court Rule regarding discovery provides:

> (1) When a mental or physical condition of a party is in controversy, medical information about the condition is subject to discovery under these rules to the extent that
>
> (a) the information is otherwise discoverable under MCR 2.302(B), and
>
> (b) the party does not assert that the information is subject to a valid privilege. [MCR 2.314(A)(1).]

Pursuant to MCR 2.314, defendant sought discovery of plaintiff's mental history. Plaintiff refused this request, asserted the physician-patient privilege, and contended:

> Plaintiff states [in his complaint] that he is seeking damages for mental anguish, humiliation, embarrassment, and the like, which are psychic damages. He is not claiming psychiatric injury or exacerbation of a pre-existing psychological or psychiatric condition.

Because plaintiff asserted the privilege to shield his mental history from discovery, defendant asked the trial court by a motion in limine to preclude plaintiff from introducing any evidence of emotional distress at trial, pursuant to MCR 2.314(B)(2):

> Unless the court orders otherwise, if a party asserts that the medical information is subject to a privilege and the assertion has the effect of preventing discovery of medical information otherwise discoverable under MCR 2.302(B), the party may not thereafter present or introduce any physical, documentary, or testimonial evidence relating to the party's medical history or mental or physical condition.

Plaintiff argued to the circuit court that MCR 2.314(A)(1) did not apply because "as long as the claim for non-economic damages is restricted to embarrassment, humiliation, outrage and indignation, which some courts are referring to as the garden variety of emotional injuries,[4] . . . the medical and psychologic[al] records are not relevant and are not likely to lead to any relevant or admissible evidence." The trial court incorrectly ruled that it would permit plaintiff to introduce evidence regarding embarrassment, humiliation, outrage, and indignation, but not mental anguish and emotional distress. In an August 12, 1994, opinion, the trial court refused plaintiff's request to expand the ruling to permit evidence of damages for mental anguish.

At trial, the court attempted to limit plaintiff's evidence to his feelings of indignation, embarrassment, humiliation, and outrage and to prohibit testimony regarding emotional distress or mental anguish. Thus, plaintiff testified that he felt disgusted, frustrated, and embarrassed, that he felt angry, disrespected, and very insignificant as a person, and that he felt like "a broke forty-one year old man living with his mother." At one point, the trial court sustained defendant's objection that plaintiff's testimony was invading the province of emotional/mental anguish. As previously stated, the jury ultimately awarded plaintiff $20,000 in noneconomic damages for outrage, indignation, humiliation, or embarrassment resulting from racial discrimination in his employment. We reverse this

---

[4] Some other states actually use the term "garden variety" emotional injuries. See *Doyle v Superior Court*, 50 Cal App 4th 1878, 1881, 1888; 58 Cal Rptr 2d 476 (1996); *Sabree v United Brotherhood of Carpenters & Joiners, Local No 33*, 126 FRD 422, 426 (D Mass, 1989).

award because it was predicated on evidence of damages that should have been excluded by the trial court.

It is well established that victims of discrimination may recover for psychic injuries such as humiliation, embarrassment, outrage, disappointment, and other forms of mental anguish that flow from discrimination. *Jenkins v Southeastern Michigan Chapter, American Red Cross*, 141 Mich App 785, 799; 369 NW2d 223 (1985). See also *Phillips v Butterball Farms Co, Inc (After Second Remand)*, 448 Mich 239, 250-253; 531 NW2d 144 (1995). However, the trial court clearly erred in attempting to create two separate categories of psychic injuries: (1) "serious" injuries such as "emotional distress" and "mental anguish," and (2) "garden variety" injuries, such as hurt feelings, outrage, embarrassment, and humiliation. Such a distinction cannot be realistically maintained. In *Veselenak v Smith*, 414 Mich 567, 576; 327 NW2d 261 (1982), which addressed the duplication between ordinary damages and exemplary damages, the Court rejected the contention that "ordinary damages for shame and mortification" and "exemplary damages for humiliation and indignity" compensated for separate wrongs. In fact, the Court held:

> These distinctions are . . . legally unsound. Semantic niceties aside, juries are not asked to differentiate between mental states, such as shame, mortification, humiliation and indignity. Juries are asked to compensate mental distress and anguish, which flows naturally from the alleged misconduct and may be described in such terms as shame, mortification, humiliation and indignity. [*Id.*]

See also *Phinney v Perlmutter*, 222 Mich App 513, 534; 564 NW2d 532 (1997), " '[a]ctual damages in

Michigan, particularly when an intentional wrong is involved, . . . include damages for emotional stress, embarrassment and humiliation,'" quoting *Shaw v Cassar*, 558 F Supp 303, 311 (ED Mich, 1983) and citing *Phillips, supra* at 250-253. In other words, as a practical matter, our courts have not recognized "garden-variety" emotional injuries or any other two-tiered approach to emotional or psychic injuries. Cf. *Doyle v Superior Court*, 50 Cal App 4th 1878, 1881, 1888; 58 Cal Rptr 2d 476 (1996); *Sabree v United Brotherhood of Carpenters & Joiners, Local No 33*, 126 FRD 422, 426 (D Mass, 1989).

Here, the court clearly erred in allowing plaintiff to introduce evidence of noneconomic injury despite his invocation of the physician-patient privilege. Under the express provisions of MCR 2.314(B)(2), "if a party asserts that the . . . information [sought] is subject to a privilege and the assertion has the effect of preventing discovery of medical information otherwise discoverable . . . the party may not thereafter present or introduce any . . . evidence relating to the party's medical history or mental or physical condition." The circuit court, rather than enforcing the rule, eviscerated it. Plaintiff placed his emotional condition in issue by seeking damages for his alleged mental anguish, outrage, embarrassment, and humiliation. Given plaintiff's assertion of the privilege, the trial court erred in permitting plaintiff to testify at trial about these injuries.

Where, as here, a plaintiff in an employment discrimination case seeks recovery for anything beyond economic damages (such as pain and suffering, mental distress, hurt feelings, embarrassment, and so forth), we hold that he has thereby placed his mental

condition in issue and consequently open to discovery. MCR 2.314(A). In order for a defendant to defend a claim for noneconomic damages, he must be permitted to determine, through discovery, whether factors other than the defendant's alleged misconduct may have influenced the plaintiff's emotional and mental condition. To preclude discovery of the plaintiff's mental or psychological history while permitting the plaintiff to testify regarding noneconomic damages, would deprive the defendant of a fair trial. Thus, if the plaintiff asserts the privilege to prevent discovery on this issue, the plaintiff must withdraw, or the court must dismiss, any claim for noneconomic damages.[5] MCR 2.314(B).

The trial court's ruling regarding the motion in limine (and therefore its subsequent evidentiary rulings regarding the same issue) were erroneous. We therefore reverse the judgment with regard to this issue.

Plaintiff contends that the circuit court erred in not going far enough—in failing to permit plaintiff to present more specific and additional evidence of mental anguish. In light of the above discussion, this issue may be summarily rejected.[6]

---

[5] To that extent that a defendant might abuse the discovery process or the information obtained through discovery, the trial court retains discretion to prevent such abuse. MCR 2.302(C).

[6] Plaintiff also maintains that MCR 2.314(B) is not implicated because he did not actually consult or treat with any professional practitioner as a result of the injuries he sustained (i.e., so there were no medical records to discover). We disagree. Plaintiff did not resist discovery on the grounds that he had never been treated. Rather, he asserted the physician-patient privilege, thereby precluding defendant from discovering whether medical records in fact existed. It was the very invocation of the privilege itself that triggered the rule. MCR 2.314(B)(2); *Jordan v Sinai Hosp of Detroit, Inc*, 171 Mich App 328, 345; 429 NW2d 891 (1988). Defendant should not

C

Plaintiff next contends that the jury's verdict in defendant's favor with regard to the issues of retaliation and termination were contrary to the great weight of the evidence. Because no motion to this effect was presented below, the issue has not been preserved for appellate consideration. *People v Bradshaw*, 165 Mich App 562, 565; 419 NW2d 33 (1988); *DeGroot v Barber*, 198 Mich App 48, 54; 497 NW2d 530 (1993). Our refusal to consider this issue will not result in a miscarriage of justice. See *Richmond Twp v Erbes*, 195 Mich App 210, 218; 489 NW2d 504 (1992).

D

Docket No. 190178 concerns the issue of sanctions for rejection of mediation, pursuant to MCR 2.403. This case was mediated at $20,000; plaintiff rejected this evaluation, defendant accepted it. The jury subsequently adjudicated two of plaintiff's claims on September 28, 1994, awarding him nothing on one claim and $20,000 on the other. The trial court, sitting as the Court of Claims, did not adjudicate plaintiff's remaining claim (breach of contract) until October 19, 1995, deciding it adversely to plaintiff. The trial court then agreed with defendant's assertion that the interest on plaintiff's $20,000 verdict was $1,204, that plaintiff's taxable costs were $162, and that the adjusted verdict ($20,000 + $1,204 + $162 = $21,366) was therefore more favorable to defendant than to plaintiff.[7]

---

be compelled to accept at face value plaintiff's assertion that his refusal of discovery was proper because there was nothing to discover.

[7] The adjusted verdict of $21,366 was therefore $634.01 short of satisfying the requirement of MCR 2.403(O)(3) that it must be more than ten percent above the evaluation in order for plaintiff to qualify for sanctions.

Plaintiff alleges that the circuit court's award of mediation sanctions to defendant was erroneous in two respects. First, plaintiff alleges error because the total verdict in plaintiff's favor (including an award of attorney fees under the Civil Rights Act) exceeded the mediation evaluation by more than ten percent. Second, plaintiff alleges error because defendant did not submit a request for sanctions until more than twenty-eight days after the September 28, 1994, verdict was rendered.

However, we need not address these issues because the verdict itself no longer stands. "[I]t is the ultimate verdict that the parties are left with after appellate review is complete that should be measured against the mediation evaluation to determine whether sanctions should be imposed on a rejecting party pursuant to MCR 2.403(O). " *Keiser v Allstate Ins Co*, 195 Mich App 369, 374-375; 491 NW2d 581 (1992). Here, a no-cause verdict is clearly more favorable to defendant than the $20,000 mediation evaluation; the mediation sanctions imposed upon plaintiff are affirmed.

E

Our ruling today makes clear that if a plaintiff in an employment discrimination case asserts the privilege to shield from discovery his mental or emotional history, he may not present any evidence of noneconomic damages at trial.[8] Because plaintiff here asserted this privilege, and defendant was not

---

[8] Whether a plaintiff asserts the physician-patient privilege, the psychiatrist-patient privilege, the psychologist-patient privilege, or a similar privilege, the rule is the same—if he invokes the privilege to prevent discovery, he cannot claim noneconomic damages.

afforded discovery with respect to plaintiff's noneconomic damages claims, plaintiff should not have been permitted to introduce evidence of noneconomic damages. The jury's verdict—against plaintiff on his claims of discriminatory discharge and retaliation—precludes retrial of any issues concerning *economic* damages on remand. Our ruling—precluding claims for noneconomic damages where the privilege has been invoked—precludes retrial of any issues concerning *noneconomic* damages on remand. Where there can be no evidence of damages, we see no need for a new trial. We therefore reverse the judgment reflecting the jury verdict, and the award of costs and attorney fees, see *Davey v DAIIE*, 414 Mich 1, 4, 13; 322 NW2d 541 (1982), and we remand for entry of a judgment of no cause of action. We affirm the circuit court's rulings in other respects, as set out herein.

Affirmed in part, reversed in part, and remanded with directions in part. Defendant, being the prevailing party, may tax costs on appeal, pursuant to MCR 7.219.