*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CURTIS BARNES,

        Plaintiff-Appellee,

and

ALWAYZ ON TIME TRANSPORTATION and
TOTAL TOXICOLOGY LABS, LLC,

        Intervening Plaintiffs,

and

SYNERGY SPINE AND ORTHOPEDIC
SURGERY CENTER, LLC, and ST. JOHN
MACOMB-OAKLAND HOSPITAL,

        Intervening Plaintiffs-Appellees,

v

21ST CENTURY PREMIER INSURANCE
COMPANY,

        Defendant-Appellant.

FOR PUBLICATION
November 5, 2020
9:00 a.m.

No. 347120
Wayne Circuit Court
LC No. 16-002217-NF

Before: BOONSTRA, P.J., and MARKEY and HOOD, JJ.

PER CURIAM.

Defendant 21st Century Premier Insurance Company (CPIC) appeals by right a consent judgment that was entered following a one-day jury trial in which jurors solely determined that plaintiff Curtis Barnes was domiciled in the same household as his grandparents on the date that Barnes was injured in a motor vehicle accident. The grandparents had a no-fault automobile insurance policy through CPIC when the accident occurred. MCL 500.3114(1) generally provides that a no-fault policy "applies to accidental bodily injury to the person named in the policy, the

-1-

person's spouse, *and a relative of either domiciled in the same household*, if the injury arises from a motor vehicle accident." (Emphasis added.) This case presented the question whether Barnes was domiciled in the same household as his grandparents, and the trial court denied two motions for summary disposition filed by CPIC, as well as CPIC's motion for directed verdict raised during the trial. On appeal, CPIC argues that the trial court erred by denying the motions for summary disposition and directed verdict and that the jury's verdict was against the great weight of the evidence. We disagree and affirm.[1]

## I. OVERVIEW

Barnes sustained injuries in a car accident on September 27, 2013, at which time his grandparents held the no-fault policy issued by CPIC. It is undisputed that on that date Barnes was living in the same two-story house as his grandparents, but the property was separated into "upstairs" and "downstairs" units. Barnes resided in the upstairs unit, and his grandparents resided in the downstairs unit. The parties presented substantial evidence at summary disposition and at trial. Barnes and intervening plaintiffs argued that the evidence showed that the two units constituted one household for purposes of MCL 500.3114(1), and CPIC contended that the evidence reflected that the two units were separate and distinct households under MCL 500.3114(1). As indicated above, the trial court denied motions for summary disposition and directed verdict brought by CPIC, and the jury rendered a verdict in favor of Barnes, after which CPIC consented to entry of judgment against it while reserving the right to appeal the underlying rulings and verdict.

## II. THE PERTINENT EVIDENCE

CPIC relied on evidence that the upstairs and downstairs units had their own entrances, living rooms, bedrooms, kitchens, bathrooms, gas and electric meters, furnaces, hot water heaters, thermostats, and doorbells. Barnes's grandfather referred to the "five and five," meaning that there were five rooms downstairs and the same five rooms upstairs (living room, two bedrooms, kitchen, and bathroom). CPIC also pointed to evidence that the two units were separated by an interior door equipped with a deadbolt, that Barnes and his grandmother testified in their depositions that Barnes had everything he needed in the upstairs unit, that Barnes paid his own gas and electric bills, and that Barnes paid half of the mortgage and water bills for the house. Additionally, CPIC cited a copy of the no-fault insurance application that Barnes's grandfather had submitted on December 7, 2010, which listed another grandson, who lived with the grandparents in the downstairs unit, as a "household member," while failing to list Barnes as such.

---

[1] The claims of intervening plaintiffs Alwayz On Time Transportation and Total Toxicology Labs, LLC, neither of which is a party to this appeal, were dismissed before trial. Intervening plaintiffs Synergy Spine and Orthopedic Surgery Center, LLC, and St. John Macomb-Oakland Hospital provided medical services to Barnes, and they are parties to this appeal.

Barnes and the intervening plaintiffs relied on evidence that only family members had lived in the house for nearly 50 years, that the cable bill was the only utility bill that Barnes paid,[2] that the interior doors of the house were never locked, including the door between the lower and upper levels, that Barnes regularly and freely entered the downstairs unit to do laundry and to retrieve items such as food, towels, and linen, and that Barnes contributed money toward expenses of the house but had no rental agreement with his grandparents. They further cited evidence that the cost of house repairs was evenly split regardless of whether only one unit or level was involved, that the house had only one mailbox and address, which Barnes used as his own personal address, that the home was zoned single-family residential, that Barnes and his grandparents had a very close relationship, that Barnes kept personal effects in the house, and that the grandparents set rules for the upstairs unit concerning noise, company, and similar matters. There was also testimony developed at trial showing that Barnes's grandparents could and did enter the upstairs unit at will without the need to obtain Barnes's permission, that the grandmother would sometimes cook using the stove in the upstairs level, that Barnes was always welcome and spent time in the downstairs unit, where he sometimes cooked, and that on occasion they all shared meals together.

## III. THE TRIAL COURT'S RULINGS

With respect to the initial motion for summary disposition, CPIC argued that, in light of the evidence discussed above, there was no genuine issue of material fact that Barnes's upstairs unit constituted a separate household distinct from the downstairs unit where the grandparents resided. The trial court concluded that a genuine issue of material fact existed regarding whether the house encompassed one or two households, distinguishing the caselaw that CPIC relied on. The trial court deemed it important that there was free, easy, and exercised access between the upstairs and downstairs units that could have been prevented using readily available means but had never been employed for nearly 50 years of heavy family use.

Subsequently, CPIC renewed its motion for summary disposition on the issue of domicile, mostly reiterating its prior arguments. At the ensuing motion hearing, the trial court refused to reconsider the question of Barnes's domicile as a whole, reasoning that it had already decided that issue when ruling in regard to CPIC's initial motion for summary disposition. Instead, the court stated that it would only consider the import of the sole piece of new evidence that CPIC had presented—the December 7, 2010 insurance application. CPIC's attorney argued that the grandfather's failure to list Barnes as a household member on the insurance application revealed the grandfather's "subjective belief" that Barnes resided in a "separate" household in the upstairs unit. The trial court questioned CPIC's counsel with respect to the *temporal* relevance of the insurance application, asking whether Barnes even lived in the house at the time of the application. Counsel replied, "My understanding is that Barnes did live there, at the time." When the court asked about supporting evidence, CPIC's attorney cited unspecified "answers to interrogatories," admitting that CPIC had failed to submit those answers to the court. And, without any evidentiary support, counsel also argued that in subsequent "renewals of the policy" the grandfather had failed to list any additional residents. On the other hand, Barnes's counsel indicated that he was uncertain

---

[2] Barnes indicated that a cousin lived with him in the upstairs unit, and Barnes did not know if his cousin perhaps paid other utility bills associated with the upstairs unit.

whether Barnes was residing at the house when the grandfather submitted the insurance application.

Thereafter, the trial court chastised the parties for creating "a morass of total confusion." The court observed that it had "insufficient information to make a ruling" on CPIC's renewed motion for summary disposition in the absence of any record evidence to establish the temporal relevance of the insurance application. The trial court denied the renewed motion for summary disposition without prejudice to CPIC's right to bring a similar motion at a later date. The court allowed the parties 45 days to conduct further discovery. Rather than renewing the motion for summary disposition after conducting the permitted discovery, CPIC subsequently stipulated to the entry of an order that the question of Barnes's domicile would be decided at trial. At trial, CPIC moved for a directed verdict after the close of plaintiffs' proofs. The trial court denied the motion, distinguishing caselaw cited by CPIC and determining that plaintiffs had presented evidence sufficient to create a factual issue for the jury to resolve regarding whether the property consisted of one household or two. The jury subsequently rendered a special verdict, finding that Barnes was domiciled in the same household as his grandparents when the accident occurred. Because CPIC did not dispute that Barnes was injured in the motor vehicle accident, it agreed to entry of a consent judgment, but the stipulation also reserved the right for CPIC to appeal on the issue of domicile. That appeal is before us now.

## IV. ANALYSIS

### A. SUMMARY DISPOSITION

CPIC first argues that the trial court erred by failing to grant summary disposition in its favor under MCR 2.116(C)(10). CPIC contends that the evidence established as a matter of law that Barnes was not domiciled in the same household as his grandparents but rather that he resided in a separate and distinct household—the upstairs unit of the house. We disagree.

"This Court reviews de novo a trial court's decision on a motion for summary disposition." *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). We also review de novo issues of statutory interpretation. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). "A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Id.* "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). *Pioneer State*, 301 Mich App at 377. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion.

*Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999); see also MCR 2.116(G)(6). "Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994).

Once again, MCL 500.3114(1) generally provides that a no-fault policy "applies to accidental bodily injury to the person named in the policy, the person's spouse, *and a relative of either domiciled in the same household*, if the injury arises from a motor vehicle accident." (Emphasis added.) The no-fault act, MCL 500.3101 *et seq.*, does not define the terms "domiciled" and "household." The phrase "domiciled in the same household" has been examined in several appellate decisions. In *Workman v DAIIE*, 404 Mich 477, 486-487; 274 NW2d 373 (1979), the seminal case on the matter, the plaintiff was injured in a motor vehicle accident and, shortly before the date of the crash, she had been living in a travel trailer that was owned by her insured father-in-law. The travel trailer was located on the father-in-law's property and was situated approximately 40 to 50 feet from his house. *Id.* The Michigan Supreme Court affirmed the trial court's ruling that the plaintiff was "domiciled in the same household" as her father-in-law for purposes of MCL 500.3114(1). *Id.* at 486. Our Supreme Court observed:

> [B]oth our courts and our sister state courts, in determining whether a person is a "resident" of an insured's "household" or, to the same analytical effect, "domiciled in the same household" as an insured, have articulated a number of factors relevant to this determination. In considering these factors, no one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others. Among the relevant factors are the following: (1) the subjective or declared intent of the person of remaining, either permanently or for an indefinite or unlimited length of time, in the place he contends is his "domicile" or "household"; (2) the formality or informality of the relationship between the person and the members of the household; (3) whether the place where the person lives is in the same house, within the same curtilage or upon the same premises[;] [and] (4) the existence of another place of lodging by the person alleging "residence" or "domicile" in the household[.] [*Id.* at 496-497 (citations omitted).[3]]

---

[3] In applying the four factors to the evidence and finding in favor of the plaintiff, the *Workman* Court stated:

> First, the record reveals facts indicating it was plaintiff's intention to remain living in the trailer on the property of [her father-in-law] for at least an indefinite length of time. Plaintiff testified that although she, her husband and child were temporarily staying with her younger sister in her mother's home when the accident occurred, if the accident had not happened, it was her family's intention to have gone back to the trailer and remain living there "for an indefinite period of time." Plaintiff further testified that she and her husband were not looking for any other place to live and that she considered the trailer her home. In addition, she testified that her family's mailing address was the same as her father-in-law's. Second, the

-5-

The continuing viability of these four factors was recognized in *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 497; 835 NW2d 363 (2013). The *Grange* Court also noted that this Court in *Dairyland Ins Co v Auto-Owners Ins Co*, 123 Mich App 675, 682; 333 NW2d 322 (1983), added five more factors to consider for determining domicile when adult children with complicated living arrangements and insured parents are involved. *Grange*, 494 Mich at 497 n 41.[4] The Supreme Court further indicated that "a person may have one—and *only* one—domicile." *Id.* at 494. "A domicile determination is generally a question of fact; however, where the underlying material facts are not in dispute, the determination of domicile is a question of law for the circuit court." *Id.* at 490.

Aside from the factors mentioned above, which are not very helpful in the context of the instant case, we must also examine the specific meaning of the term "household". Again, although the word is not defined in the statute, this Court has addressed the meaning of "household" as used in an insurance policy, relying on dictionary definitions.[5] In *Thomas v Vigilant Ins Co*, 156 Mich App 280, 282-283; 401 NW2d 351 (1986), this Court stated:

---

> record reveals facts indicating that the relationship between plaintiff, her husband and child, and her father-in-law's family was informal and friendly. Plaintiff testified that she was welcome to use and did use all of the facilities of the house (i. e., telephone, washers and dryers, and electricity, by cord from the house to the trailer), that her family ate meals with the senior Workman's family, and that during the day she and her child were "in and out" of the house. Third, the record reveals that the trailer in which plaintiff and her family lived was unquestionably on the same premises, or property, as her father-in-law's house, and that the trailer belonged to her father-in-law. The trailer was located forty to fifty feet from the house. The electrical power for the trailer was supplied by a cord attached to the house and water for the trailer was provided by means of a hose connected to the house. Furthermore, testimony established there was no fence or physical barrier of any type between the house and the trailer. Fourth, the record reveals that plaintiff and her family had left the apartment they were living in before moving into the trailer and had no intention of returning there (or to any other lodging). [*Workman*, 404 Mich at 497-498 (appendix citations omitted).]

[4] The *Dairyland* panel stated:

> Other relevant indicia of domicile include such factors as whether the claimant continues to use his parents' home as his mailing address, whether he maintains some possessions with his parents, whether he uses his parents' address on his driver's license or other documents, whether a room is maintained for the claimant at the parents' home, and whether the claimant is dependent upon the parents for support. [*Dairyland*, 123 Mich App at 682.]

[5] We note that it is appropriate to consider dictionary definitions of statutory terms left undefined by the Legislature. *Hegadorn v Dep't of Human Servs Dir*, 503 Mich 231, 253; 931 NW2d 571 (2019).

> *Black's Law Dictionary* (rev 4th ed), p 873, defines "household" as: "a family living together . . . [t]hose who dwell under the same roof and compose a family." *Webster's Third New International Dictionary* (1971) defines "household" as: "[t]hose who dwell under the same roof and compose a family; a domestic establishment; specifically, a social unit comprised of those living together in the same dwelling place." *The American Heritage Dictionary of the English Language* (1976) defines "household" as: "[a] domestic establishment including the members of a family and others living under the same roof." The commonly understood meaning of the word "household" is a family unit living under the same roof. [Alterations and ellipses in original.]

We hold that the trial court did not err by denying CPIC's motions for summary disposition. Viewing the evidence in a light most favorable to Barnes and the intervening plaintiffs, we agree the evidence supported a conclusion that Barnes and his grandparents formed one family unit living together under the same roof. The house has been used as a family residence and domicile for nearly 50 years; only family members have lived in the home. In our view, the key in this particular case is not the physical structure or design of the house, in and of itself, but rather the conduct and behaviors of the people living in the house in the context of that specific structure or design. Of course, the fact that the upstairs unit can stand alone as a fully functional home—having bedrooms, a bathroom, a living room, and a kitchen—is a relevant consideration, as is the fact that the upstairs unit has its own furnace, hot water heater, gas and electric meters, thermostat, and doorbell. The evidence, however, also revealed that interior doors were not locked, including the door between the upper and lower units, that Barnes regularly went into the downstairs unit for various purposes absent the need for permission, that the grandparents had free and unconstrained access to the upstairs unit, which was exercised on occasion, and that Barnes pitched in financially at times by helping cover costs associated with the whole house and not just the upstairs unit. If the evidence had conclusively established that the connecting door between the two units was always locked, that Barnes never accessed the lower unit, nor had the liberty to do so, that his grandparents never accessed the upper unit, nor had the freedom to do so, and that costs were never shared, we would conclude that Barnes and his grandparents were not "living together" as a family unit in the same household and were instead, effectively, living separately in two distinct households. But that was simply not the situation presented in this case—it was just the opposite. Indeed, we believe that the trial court could have properly entered summary judgment in favor of Barnes and the intervening plaintiffs.

Furthermore, the whole discussion regarding whether Barnes was effectively paying rent and that he paid costs associated with the upstairs unit is of limited relevance in determining whether there were two separate and distinct households. Had there been a typical upstairs for a two-story house, e.g., a couple of bedrooms and a bathroom, and had Barnes lived in the house and slept in one of the upstairs bedrooms, his payment of rent to stay in the home or his financial contributions for a pro rata share of utility usage would not change the fact that he was domiciled in the same household as his grandparents. In other words, adult children and grandchildren sometimes pay "rent" to their parents or grandparents when living in their homes, or otherwise help with expenses associated with stays in a home, regardless of the physical configuration of a particular house. Consequently, the payment of rent is not that telling in determining whether two separate households exist within the same structure. Rental or other payments connected to a

living space do not really shed light on whether persons are living together as a family unit under the same roof.

Next, the *Workman* factors favor a finding that Barnes was domiciled in his grandparents' household. Barnes had no other place of lodging at the time of the accident; he was living in the same house as his grandparents; he intended, at the time of the accident, to remain in the upstairs unit of his grandparents' house for an indefinite length of time; and he had a close and informal relationship with his grandparents. See *Workman*, 404 Mich at 496-497. The *Dairyland* factors that pertain to adult children are not really relevant and do not squarely fit the situation, although Barnes and his grandparents did share the same mailing address, which weighs in Barnes's favor. *Dairyland*, 123 Mich App at 682.

With respect to the insurance application, we find it to be a red herring. *Assuming* that Barnes was living in the house and upstairs unit when his grandfather filled out the insurance application in 2010, the fact that his grandfather did not view Barnes as being a household member really has little to no bearing on the statutory question whether Barnes was domiciled in the same household as his grandparents. Barnes's grandfather was not engaged in a legal analysis of, or making a legal determination under, MCL 500.3114(1) when he was filling out the application. Stated otherwise, the grandfather's presumed subjective assessment that Barnes did not reside in the grandparents' household does not and cannot control the determination under MCL 500.3114(1). Our position would be the same had the grandfather listed Barnes as a household member in the insurance application—doing so would not make it so for purposes of MCL 500.3114(1). And we suspect that CPIC would make that very argument if Barnes had been identified in the application as a household resident. To the extent that the insurance application had any relevancy, the evidence certainly did not demand summary dismissal of the complaint.

We do find it necessary to address a couple of cases that CPIC relies on. CPIC places a great deal of weight on this Court's opinion in *Fowler v Auto Club Ins Ass'n*, 254 Mich App 362; 656 NW2d 856 (2002). In *Fowler*, the plaintiff was injured while repairing a truck, and, under MCL 500.3114(1), he sought insurance benefits pursuant to a no-fault policy the defendant insurer issued to his mother, claiming the status of a relative domiciled in his mother's household. *Id.* at 363. The trial court determined as a matter of law that the plaintiff was not domiciled in his parents' household. *Id.* After noting the factors set forth in *Workman* and *Dairyland*, the *Fowler* panel ruled as follows:

> In this case, at the time of the accident plaintiff was divorced, was approximately thirty years old, and lived with his girlfriend in a carriage house apartment located next to his parents' house. Plaintiff had lived in the carriage house apartment for more than three years before he was injured, and did not have any plans to move. The carriage house and the main house had a shared address; however, the carriage house had its own entrance, its own set of locks, and its own walkway. The apartment consisted of a kitchen, a bathroom, a living room, and four bedrooms. Plaintiff testified that the carriage house had its own water, electric, gas, and telephone service, and that he or his girlfriend paid the utility bills. Plaintiff paid his parents, who had keys to the carriage house, rent of $500 a month, although the rental agreement was not reduced to a writing. Until he was injured, plaintiff and his girlfriend both worked and they shared housekeeping, laundry, and grocery

-8-

shopping responsibilities. Plaintiff performed lawn maintenance and snow removal for his parents, and had an informal relationship in which he was allowed full access to their home. Plaintiff and his parents often ate together.

> We find that the trial court properly concluded that the carriage house residence was a self-sufficient, freestanding, and independent residence, and that after weighing the pertinent factors it was clear that plaintiff was not domiciled with his parents. Unlike the arrangement in *Workman*, the evidence in this case established that plaintiff's living arrangement was independent from his parents' household. Plaintiff did not have a room in his parents' house, he did not rely on his parents for utilities or appliances, and plaintiff paid rent until he was injured. The fact that plaintiffs' parents had keys to the carriage house and that plaintiff stored items of personal property in his parents' house was insufficient in the face of the other evidence to make him a member of their household. *Dairyland*, *supra* at 684. On these facts, the trial court correctly determined as a matter of law that plaintiff was not domiciled in his parents' household and therefore was not entitled to benefits under his mother's no-fault policy. [*Fowler*, 254 Mich App at 365-366.]

First, "a self-sufficient, freestanding, and independent residence," a carriage house, was at issue in *Fowler*, not a mere single family house structure. The facts in *Fowler* did not reach the level of depicting a group of individuals living together as a family unit. Furthermore, while the plaintiff in *Fowler* had access to his parents' home, it does not appear that he actually accessed and utilized his parents' home as regularly as Barnes did in relation to the downstairs unit of his grandparents' house. As opposed to the circumstances in *Fowler*, there was evidence here that Barnes's living arrangement was not independent from his grandparents' household.

In *Hicks v Automobile Club Ins Ass'n*, 189 Mich App 420, 421-422; 473 NW2d 704 (1991), the plaintiff was injured while alighting from a vehicle, and she filed suit against her son's insurer, arguing that she and her son were domiciled in the same household. The trial court concluded that the plaintiff and her son were not domiciled in the same household. *Id.* at 422. And this Court held that the trial court did not commit error. *Id.* The evidence established that the plaintiff and another individual, McMillan, had "purchased a house which was divided into two separate units, one upstairs and one downstairs." *Id.* The plaintiff and McMillan lived in the lower unit, and the plaintiff's son and his family occupied the upper unit. *Id.* "Each unit had its own living area, sleeping quarters, kitchen, and bathroom." *Id.* And "[t]he units had separate entrances, post office addresses, telephone lines, and electric bills." *Id.* Additionally, there was a formal agreement pursuant to which plaintiff's son paid her $200 per month in rent. *Id.*

*Hicks* made no mention whatsoever regarding cross-access and cross-use of the upper and lower units by the family members, which renders *Hicks* of little value to us. Contrary to the evidence in this case, there is no indication in *Hicks* that the plaintiff, McMillan, the plaintiff's son, and the son's family were living together as a family unit in the house.

In sum, we conclude that the trial court did not err by denying CPIC's motions for summary disposition because there was a genuine issue of material fact regarding whether Barnes was domiciled in the same household as his grandparents.

B. MOTION FOR DIRECTED VERDICT

CPIC next argues that the trial court erred by denying its motion for directed verdict. This Court reviews de novo a trial court's ruling on a motion for directed verdict. *Nahshal v Fremont Ins Co*, 324 Mich App 696, 718-719; 922 NW2d 662 (2018). A motion for directed verdict challenges the sufficiency of the evidence. *Id*. at 719. A directed verdict "is only appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Id.* If reasonable persons could honestly reach different conclusions regarding whether the nonmoving party established a claim, the motion for directed verdict must be denied, with the case being resolved by the jury. *Id.* With respect to a motion for directed verdict, "[a]n appellate court recognizes the jury's and the judge's unique opportunity to observe the witnesses, as well as the factfinder's responsibility to determine the credibility and weight of trial testimony." *Zeeland Farm Servs, Inc v JBL Enterprises, Inc*, 219 Mich App 190, 195; 555 NW2d 733 (1996). "Credibility determinations are inappropriate" for purposes of ruling on a motion for directed verdict. *Williamstown Twp v Hudson*, 311 Mich App 276, 287; 874 NW2d 419 (2015).

The evidence presented at trial essentially mimicked the evidence the parties submitted in support of the motions for summary disposition and their responses to them. And the principles guiding analysis of motions for summary disposition parallel those applicable to analyzing motions for directed verdict. See *Monaco v Home-Owners Ins Co*, 317 Mich App 738, 745; 896 NW2d 32 (2016) ("The test with respect to a motion for summary disposition brought under MCR 2.116[C][10] is essentially the same in regard to a motion for a directed verdict[.]"). The jury was presented evidence that Barnes and his grandparents were living together as a family unit, i.e., that Barnes was domiciled in the same household as his grandparents. Accordingly, for the reasons discussed earlier, we hold that the trial court did not err by denying CPIC's motion for directed verdict.

C. GREAT WEIGHT OF THE EVIDENCE

Finally, CPIC argues that the jury's verdict was against the great weight of the evidence. Under MCR 2.611(A)(1)(e), a trial court may grant a new trial when a jury's verdict was "against the great weight of the evidence or contrary to law." In *Campbell v Sullins*, 257 Mich App 179, 193; 667 NW2d 887 (2003), this Court stated:

> Plaintiff next argues that the trial court abused its discretion by denying plaintiff's motion for a new trial on the asserted ground that the jury's verdict was against the great weight of the evidence. We review the trial court's denial of a motion for a new trial for an abuse of discretion. In deciding whether to grant or deny a motion for a new trial, the trial court's function is to determine whether the overwhelming weight of the evidence favors the losing party. This Court gives substantial deference to a trial court's determination that the verdict is not against the great weight of the evidence. This Court and the trial court should not substitute their judgment for that of the jury unless the record reveals that the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. [Citations omitted.]

"The jury's verdict should not be set aside if there is competent evidence to support it." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 498; 668 NW2d 402 (2003). The question of witness credibility is generally left for the finder of fact to assess. *Dawe v Bar-Levav & Assoc, PC (On Remand)*, 289 Mich App 380, 401; 808 NW2d 240 (2010). Similarly, it is for the jury to decide how much weight should be given to testimony. *Id.*

CPIC failed to file a motion for new trial as required to preserve an appellate argument that a jury's verdict was against the great weight of the evidence. *Hyde v Univ of Mich Regents*, 226 Mich App 511, 525; 575 NW2d 36 (1997); see also MCR 7.211(C)(1)(c) (no need for remand to file a motion for new trial following a *bench* trial in order to preserve a claim that the verdict was against the great weight of the evidence). Moreover, even if properly preserved, CPIC's argument fails. It was for the jury to assess Barnes's credibility and that of his grandmother, both of whom testified at trial.[6] The record simply does not reveal that the evidence, which we discussed at length above, preponderated so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. Indeed, there was competent evidence to support the jury's verdict that Barnes was domiciled in the same household as his grandparents when the accident occurred. We thus conclude that the jury's verdict was not against the great weight of the evidence.

We affirm. Having fully prevailed on appeal, Barnes and intervening plaintiffs may tax costs under MCR 7.219.

/s/ Mark T. Boonstra
/s/ Jane E. Markey
/s/ Karen M. Fort Hood

---

[6] The deposition testimony of Barnes's grandfather was read to the jury.

-11-